Good morning. Good morning, your honors. May it please the court, I'm Justin Augustine on behalf of Appellants, the Center for Biological Diversity and Earth Islands Institute, and respectfully I'd like to reserve three minutes for rebuttal. Yes, thank you. I'm going to address two primary issues today, but before we jump into that, I want to first highlight two really important facts about why plaintiffs are seeking National Environmental Policy Act, NEPA, compliance in this case. First, the owl habitat at issue in this case is not just, you know, some marginal habitat or potential habitat. This is the best of the best. We know that because the record tells us so. It says that these five territories the plaintiffs care about are not just occupied by owls, it is occupied by owls with the highest level of productivity, meaning that they have had a reproductive success, and that's a big deal because of the second fact that I want to highlight, which is the precipitous population decline that these owls are experiencing, as established in the record as well, over a 20-year period of 50% decline, and therefore the owls that have reproductive success are the ones that can help reverse that, and so these very owls are essentially the most important ones out there. Here's what I understand. If I'm wrong, you've got the Farm Bill, and the Farm Bill seemed to say that you've got all these forests that are in real danger because you've got a buildup of firewood and disease and insects and the like. We want to identify them. No change of status. You're just going to identify them, and what the argument is is that if you don't change the status, there's no need to do NEPA. You've got a special circumstance in one part of this case involving the owls, but with respect to the overall designation, I'm really struggling with the idea that you need to do anything related to NEPA because nothing's changed, and the case that you cited, something did change. Well, two answers on that. First, the circumstances have very much changed. That's why there's such a big deal here, because after a designation, those lands that have been designated as treatment areas are now available for either a 6591A-D project, which has a streamlined NEPA process, or can now be subject to a 6591B categorical exclusion process. But then you do have an argument for NEPA in those, right? Because something's being done, not just a designation. Right. I don't think that's accurate, Your Honor, because California Wilderness addressed that very question and answered that you don't need to have on-the-ground impacts for programmatic NEPA to apply to a situation, and this case is really on all fours with the... But in that case, there was an impact. There were things that happened, not just a designation. I respectfully disagree. The only thing that happened was a designation of corridor areas, which is the exact same situation as here, where there is a designation of treatment areas. Nothing else changed other than here now on a map are corridor areas that can be used for the streamlined transmission corridor process. It's the exact same situation here, Your Honor. I read the case differently, but I'll talk to you about that in a minute, so go ahead. I want to also say that... Can I have you go back to that case for a moment? Because there in that case, the end of the line, but as Judge Smith had started talking about the Farm Bill, which creates a two-step process. At the first step, all you're doing is designating, which may superficially appear similar to the designation in the California Wilderness case, but here there's a second step, which is then the approval of specific projects. But there, that was final agency action. So doesn't that take you completely outside the realm of the California Wilderness case? No, not at all, Your Honor. California Wilderness is actually directly on point with us, because they found final agency action, even though there was going to be a second step in the process. Specifically, that second step was going to be actually doing transmission corridors at site-specific areas. As far as DOE was concerned in that case, that was the end of the line for them, wasn't it? It switched to a different agency. Oh, absolutely, but that's a distinction without a difference, because many times, as I pointed out in the briefs, many times the Forest Service and other agencies have a two-step process where one part of the agency does the first half, another part of the agency does the second half. For example, forest plans. The Forest Service itself issues that forest plan at the forest supervisor level, and then at the project level, other staff at the Forest Service conducts the project level analysis. So it really shouldn't matter for the outcome under the Ninth Circuit case law here. Under California Wilderness, I did find my notes on this. For one thing, the statute was very different, because that statute specifically stated that acceptance, specifically provided, nothing in this section affects any requirement of an environmental law of the United States, including the National Environmental Policy Act. So the bottom line is, whereas the Farm Act exempted it, apparently, the other one specifically says you've got to comply with NEPA. That's a significant difference right there. No, Your Honor. Specifically, Section 6591A does nowhere exempt designation of treatment areas from NEPA, and this circuit's case law specifically says that absent an express exemption, the default is that you assume NEPA applies. I don't see anywhere in 6591A where there's an exemption from NEPA, and in fact, it refers to Section 6514 of NEPA in Section 6591A, and 6514 references the applicability of NEPA. So I don't, respectfully, I don't understand how that distinction actually exists. In Ninth Circuit case law that we pointed out, the San Luis case, very clearly states, and we go to length in the briefs about this, that first, is there an express exemption? If not, and the answer there here, excuse me, the answer here is no, there's not an express exemption. So it says one of two exceptions apply. The first exception is an irreconcilable conflict. We explain why that's not applicable here, and the second is displacement, and we explain why that's not applicable here. So I don't believe that California wilderness is really any different with respect to how NEPA plays out in, with respect to Section 6591A. I also want to go back to Your Honor's statement about final agency action, because this, in the North Coast case, where they found that there wasn't final agency action, and that what defendants, or at least defendant-intervenors cited to, is a very different situation, because they stated, plaintiffs challenged the BLM's, quote, land withdrawal review program, which, as far as we know, and I'm quoting, is not referred to a single BLM order. In other words, as they stated, the final agency action plaintiff's challenge was essentially made up by plaintiffs. They made up the name for it. Whereas here, the designation of treatment areas, it's the title of Section 6591A. It's the very thing being called for in the statute, and therefore, final agency action should be a lot clearer to us than in the North Coast case. Is California Wilderness Coalition your best case in response to the other side's argument about the Farm Bill? Absolutely. I believe that it repudiates every one of their, their findings on that. We also have, as a primary issue in this case, the extraordinary, what's called the Extraordinary Circumstances Analysis that the Forest Service did, and which we claim is arbitrary and capricious under the Administrative Procedure Act. And I want to highlight, Your Honor, several, beyond the two key facts that I mentioned earlier at the beginning of my oral argument. This isn't just plaintiffs saying this. It's in the record where defendants explicitly state that this project may cause harmful impacts to habitat for up to 20 to 50 years. The standard we have to show at the categorical exclusion stage, which is the stage we're at, is merely that there's uncertainty with respect to the potential for significant impacts. Defendant's statement is essentially an admittance that there's the potential for significant impacts. And the fact that they think the project might be beneficial is irrelevant to this Court's decision as to whether there's similarly, or not similarly, but separately, uncertainty with respect to how this project will impact the isles at issue. And we know from the facts in this case that not only do defendants admit that their project has the potential for negative impacts for up to 50 years, we know that the literature... I thought perhaps, or perhaps I'm mistaken, I thought they said that there may be a few individuals that would be impacted, but overall, this would be beneficial to the isles. They do state that, but it's not supported by the record because, like I said, these are five territories that are critical for the population of this isle. And if you negatively impact them, which they admit, and which Ninth Circuit case law states can be a basis for finding the category or extraordinary circumstances analysis to be unlawful, that's going to negatively impact the population. In the short term. But there's also a finding that the removal of others and thinning is expected to benefit the continued survival and growth of green trees, which are also important for isles. So they're sort of balancing, yes, there's a short-term impact, but in the long run, what does that do to their Given the arbitrary and capricious standard, what do we do with that finding? Or are you attacking the underlying expertise and research that they're relying on? No, but my central point is that's irrelevant to your decision because of where we are at in the process. At a categorical exclusion step, they need to establish that there's no uncertainty. And regardless of what they think about the overall benefits of the project, if there's uncertainty, then you need to go on to do an EA. And that's important, Your Honors, because under an EA, you're going to build a much more extensive record within which to make those kind of balancing decisions. That's part of our point in the briefs is that they're at the wrong step for doing the balancing. I guess I forgot what the statute says. The CE statute says there has to be no uncertainty. The CE, there is no. I mean, you know, the categorical, the Farm Bill's definitions of the categorical exclusion. The Farm Bill does not have definitions of the categorical exclusion. This is how a categorical exclusion is defined under approximately 40 years of NEPA regulatory context. Oh, I guess my definition is not good. No uncertainty, you say? Yeah, no uncertainty. Exactly. That's what their own regulation, 36 CFR. Basically, anything to do with humans, you've got to have a NEPA because there's always uncertainty. As a matter of fact, there are barred owls out there who eat and kill spotted owls. We're not even talking about them. How do we, is that an uncertainty? Respectfully, the uncertainty has to be with respect to a specific issue. I can't just say that the owls are going to be negatively impacted. I have to prove it and that there's uncertainty. And we did. We showed that the literature in this record unequivocally establishes the potential for negative impacts, regardless of whether they believe there might be and that's the standard. Do you want to say anything on your time, counsel? I know you're going to get down there. So I appreciate that. Thank you. How about you're going to tell us that Ninth Circuit law says something different? I'll endeavor to do that, Your Honor. May it please the court, Clay Sanford from the United States Department of Justice on behalf of the Forest Service. I will also endeavor to save four minutes for the counsel for defendant intervenors. The United States Forest Service faces a crisis in forest service management. Millions of acres of forested land in the Western United States are threatened by disease, by insect infestation, by drought, and by the risk of catastrophic wildfire. In 2014, Congress endeavored to give the Forest Service a new tool to address these threats. They amended the Healthy Forest Restoration Act to create a two-step process that would help expedite the treatment of insect infested and diseased forests. At the first step, the Forest Service is to designate areas that are suffering from these particular forest conditions. And at the second step, projects within designated areas, which meet a series of criteria set out by Congress, may be excluded from analysis under NEPA. Counsel, your opponent contends that our case law, and I presume the underlying statute, says that if there's any uncertainty, that you must get NEPA, undertake a NEPA project. What's your response to that? So, Your Honor, with respect to my opposing counsel, the case law suggests that if there's uncertainty that would suggest a significant impact, then you can't use a categorical exclusion. It's the scope, if you will, the quantity of the uncertainty. If there's de minimis uncertainty, that does not trigger a NEPA requirement. That's right, Your Honor. As you suggested, ecology is a field where there's always going to be uncertainty. And this court in the Southwest Center for Biological Diversity case made clear that the mere presence of an endangered species in that case in a forest project area wasn't a significant and extraordinary circumstance that triggered the need for an environmental assessment under NEPA. And that was because it didn't rise to the level of significance. And so there's a level of uncertainty below the threshold level of significance at which this project deals. So, for example, in this case, we have some short-term effects on owls, but we don't think those short-term effects rise to the level of significance. And on balance, as Judge Wing was pointing out, we find that overall there won't be a benefit to the species because we are reducing the risk of wildfire damage to the habitat. If I could return, Your Honor, to the question of whether NEPA applies to... I wanted to get to this categorical exclusion in the Farm Bill. They've taken this thing, categorical exclusion, from the regulations and then put it in the Farm Bill language, right? That's what plaintiffs suggest, Your Honor. Well, where'd they get this term, categorical exclusion? You can't even say it right. So the suggestion which plaintiffs make, which is, of course, part of statutory construction, is that if you take the cluster of concepts and you import them into the bill. And I think that would have some force here, except that there are two other categorical exclusions in the HFRA, both of which explicitly require an extraordinary circumstances inquiry. The way this developed is you have the Farm Bill, and then later on there's this fire prevention bill, some years later. And when that came in, they say you have to have categorical exclusions. So it gets added some years later. And I wasn't clear under statutory construction whether I look at the whole section as it's ultimately codified, if it is codified, or if I think about the case came some years later, after a case had intervened, saying maybe you don't need categorical exclusions. So I apologize, Your Honor, it actually gets worse than that. There was a 2003 or 2004, which created the Healthy Forest Restoration Act, and there's a categorical exclusion in there for 1,000 acre assessment projects. And that explicitly says when you use this categorical exclusion, you must look for extraordinary circumstances. Then we have the 2014 Farm Bill categorical exclusion at issue here, which doesn't have that language, silent as to extraordinary circumstances. Then in April of 2018, the Farm Bill or the Healthy Forest Restoration Act was again amended to add another categorical exclusion, which does explicitly say do an extraordinary circumstances inquiry when you use this categorical exclusion. So we would suggest that the force of this congressional enactment as a whole is that when Congress wants to impose an extraordinary circumstances inquiry, it does so very explicitly. And what does it do in this case, in this particular situation under this Farm Bill, that would be instead of the categorical exclusion? What did it want? What was it doing? So, Your Honor, It obviously wants extraordinary situations to be considered. How do they get considered? So we would suggest, Your Honor, that Congress, when it created this categorical exclusion, balanced the needs for public involvement, balanced the needs for environmental analysis with the needs for expeditious treatment in the text of the categorical exclusion itself. So, for example, you can't have more than 3,000 acres treated. It can't be in a wilderness area. It can't create new roads. It has to rely on the best available science. It has to be developed through a collaborative process. And so the implication of these very fine-grained congressional enactments, we think, is that Congress wanted us to look at those things and then move on, rather than getting bogged down into additional analysis, which Congress had identified as the motivating, you know, the animating purpose behind this bill, which was you're not getting work done fast enough. And so we need you to, here's some more tools to use to try to get this work done. Except in this case, the Forest Service did do a extraordinary circumstances analysis and it put it in its handbook. It was supposed to do that, right? So, Your Honor, in this case, it did voluntarily. We would submit, do an extraordinary circumstances inquiry. As the court, district court pointed out, it's the same sort of inquiry you would get with the environmental assessment. They went through a full biological evaluation. They looked at the science, which plaintiffs are relying on. They balanced it against other science. And they came out with the conclusion that there was not going to be an effect to the owl. However, they weren't required to do that. There's a white paper in the record which suggests that the agency thought it should do that, but we would submit that that white paper, which is an internal document, certainly can't contradict the unambiguous statutory language before the court. It's certainly not a legally enforceable binding document. I would like to... But what do you want us to do here? You want us to say you weren't arbitrary and capricious in making your extraordinary circumstances determination? So I think, Your Honor, we would ask the court to uphold the district court. We would suggest that the court should find that there was no requirement to do NEPA for the area designation process, step one, and that at step two, there is no obligation to conduct an extraordinary circumstances inquiry when using this categorical exclusion. Well, the district court didn't squarely address that issue, right? And to the extent that the district court did address it, it suggested that perhaps you needed to do an extraordinary circumstances inquiry before invoking the categorical exclusion. So you're asking for us to affirm that portion as well? I think this court can affirm on any grounds supported by the record, Your Honor. So you can affirm without having to say that an extraordinary circumstances inquiry was required. But if the court wants to take that step, then we're very comfortable with the analysis this agency did. It's a very robust analysis and it supports the ultimate decision. To my colleague's question, she wanted to know whether you wanted to find that not arbitrary in capricious, if that were required. Is that your position? Yes, Your Honor. I think the first step would be to say that there was no need to conduct this analysis in the first place. But if the district court said you got to do that, and if we said you got to do that, you think it's been done, do you want us to rule on that? Yes, we would then suggest that you should affirm the district court's ruling that it was not arbitrary and capricious. Can I ask, if this were a situation where, even though there's only 3,000 acres, you're going to wipe out a species, how does that get considered under your construction of the bill? I think, Your Honor, when you ask the district court, I guess this is Judge Wynn's question, the district court found that that may language, you may use a categorical exclusion. The district court found that that triggered the need for the extraordinary circumstances inquiry. That may language gives the Forest Service the discretion to not use this categorical exclusion. And so we would rely on the expertise of the agency in this case to make those decisions. Is it appropriate to use this categorical exclusion or not? And this agency is very concerned. This record shows a large amount of concern by this agency with the fate of the spotted owl. So is it, if, if you made a decision to wipe out an entire species, then that would, that could be judicially reviewed how? It wouldn't be under, according to you, it wouldn't be under the extraordinary circumstances test because that's not needed. So the court would say what? So for example, Your Honor, it could be a violation of the Endangered Species Act, which would be a separate cause of action. It could be a finding that the, uh, that the category was inappropriately used because we didn't fit within one of the congressionally enumerated, uh, statute. Based on the best science, it didn't result from a collaborative process, et cetera, et cetera. That's right, Your Honor. If I could, before I, before I use my co-counsel's time, I'd like to, uh, to address the California wilderness case very briefly, because I think it's very distinct for three reasons from the case before the court. The first is that these two statutes are very different. The statute at issue in the California wilderness act case, the Energy Policy Act, very explicitly says you, NEPA applies unless specifically provided. And then it goes on to direct the agency to conduct a study, to analyze alternatives, all of which are hallmarks of NEPA. Here in contrast, the animating principle behind this statute was that NEPA was part of the process that was preventing the Forest Service from acting expeditiously enough to treat these problems. And so there's a very different treatment of NEPA. And my, and my, uh, counsel for the plaintiff suggests that the Healthy Forest Restoration Act at 6514 talks about NEPA applying, but 6514 is very explicitly about projects. It's not about the, um, it's not about a programmatic, sorry, it's not about the designation of areas. Secondly, the California wilderness case is different because in that case, the and influence the use of those areas without any programmatic study. And it referred explicitly to the fact this court's case law about EIS is done for forest plants. In this case, there is a forest plan. There's a programmatic document where the Forest Service sets the standards that guide how close you can come to owl habitat, how, what the canopy cover retained has to be. And the area designation doesn't change any of those categories, any of those landscape designations. And finally, we think it's distinct because the DOE, uh, the Forest Service relied on its own NEPA regulations in making its finding that there was not a, uh, NEPA applicable to the, uh, to the area designation. And unless the court has questions, I'll, I'll give him a bulk of my time over. I think he's anxious. Good morning and may it please the court. Lawson Fite on behalf of the intervener, Sierra Pacific Industries, which is the contractor on the implementation of the Sunny South project, where our forests are these days is, uh, as the government council stated, a state of crisis. Uh, we have fire risk. We have unhealthy forests, overstock stands, uh, throughout an area greater than the size of the state of Arizona. And Congress acted, um, and handed a tool to the Forest Service to try to accelerate its ability to conduct these limited, um, carefully designed restorative projects that will improve the resilience of the forest to insects, disease, and wildfire. But fundamentally, this case is a case of statutory interpretation as to whether the statute will be implemented, whether the text that Congress wrote and On the landscape designation issue, the Farm Bill is very specific about the criteria for landscape designation. It calls out three criteria, including specific data sources. One of those sources is the National Insect and Disease Risk Map. That's at, uh, 168 of the intervener's excerpts. If you look at that map, you can see that Congress had clearly had in And as Judge Smith suggested, it's more of a process of investigate, of identification. It's not, uh, it's, it's almost a ministerial process, really this landscape type identification. And, uh, the appellants, the appellants council have suggested, oh, NEPA should apply unless there's a clear indication otherwise. Those cases come from statutes that didn't mention NEPA at all. This statute was clearly enacted with NEPA in the background. It's a modification of NEPA rather than an, an overall exemption from NEPA. And a categorical exclusion is a method to comply with NEPA. And it's authorizing that tool, uh, for the agency to use. Counsel, uh, were there hearings conducted on the Farm Bill? There, uh, there were legislative hearings. There is, there is, since it is such a large piece, yeah. What I'm looking for is, did anybody testify about the impact of NEPA in terms of dealing with disease and, uh, under, I mean, under forest buildup, et cetera, et cetera, in other words, to the very points you're talking about, is there something in the record where someone specifically mentioned their concern about that? In the, in the record, there is, uh, a committee report and it talks about the, the process for approving projects not being responsive. I don't recall, uh, right here, whether it, it specifically calls out NEPA. Was that a House report or a Senate report? Uh, it's a conference report and it is in the, yeah, and it's cited in the brief sentence and it's in the record. And the, as the district court said, uh, applying NEPA to landscape analysis would undercut the whole statutory scheme. Um, I see, I'm, I see I'm over time, Your Honor, if, if I might have just one moment to address the extraordinary circumstances issue. Very quickly, because I think my colleague was particularly interested in that, so very quickly, yes. Yes, thank you. And, and this goes to Judge Rastani's question of, you know, what, how does this work, what's going to happen if there's something, uh, something like, uh, intense effects on a species? For one, as government counsel suggested, that would be a, potentially a violation of the Endangered Species Act. It would also likely be a violation of the forest plan, which is incorporated into the Farm Bill CE. Uh, forest plans are required, uh, in general to maintain viability of species, even those that aren't listed. And so what the forest, excuse me, what the Farm Bill has done is created this list of criteria for the Forest Service to use, which are in place of its regulatory extraordinary circumstances criteria. And the extraordinary circumstances criteria in general are a creature of regulation, the CEQ regulations require regulatory exclusions to have extraordinary circumstances provisions. But when Congress legislates, it can do essentially whatever it wants within constitutional bounds. And that, that's what it's done here. It's created an alternative process, uh, which can and has been subject to judicial review, particularly some of the cases in the 28J letter mentioned those, uh, old growth, best available science factors. Thank you, Your Honor. We encourage it, uh, the district court to be affirmed. Thank you very much. Counselor, you've got some rebuttal time. I'd like to use my remaining time to first address Judge Rastani's question about the lack of an explicit statement in 6591B with respect to extraordinary circumstances, because it's important that we get this right. First in 6591B, there are two terms of art. Number one, a categorical exclusion, and number two, the term scoping. Both of those terms are creatures of regular regulations, but that should not matter under Supreme Court precedent with respect to how you define a term of art, uh, and include quote under Supreme Court precedent, the cluster of ideas under those terms. Both of those terms are defined in the regulations and both of them are defined to include an extraordinary circumstances analysis. I also want to point this court to the abundance of strong evidence in the record where, so the Forest Service itself, excuse me, the Forest Service itself states over and over again that it considers this term, a categorical exclusion to be under NEPA, not exempt from NEPA, and to explicitly include a category, excuse me, a extraordinary circumstances analysis. So twice we have that in the, in the record. If I understood them correctly, the government takes the position that it didn't want to do the analysis that it did, but that it did apply the extraordinary circumstances approach and did indeed conduct an analysis, uh, as if it were required. They also want us to find that to have been, uh, to not have been arbitrary and capricious. What's your response to that? Well, if I understand your question correctly, I think this goes to Judge in the sense of not ruling on whether extraordinary circumstances analysis is required in the first place, but what address whether the extraordinary circumstances analysis they did is arbitrary and capricious or not. Is that my understanding? I guess, are you agreeing that if, if we did that, that that would be an appropriate approach to determine whether what was done was arbitrary and capricious? I apologize if I'm slow here to understand the exact, uh, some of your questions. They, they, if I understand them correctly, they said they didn't have to do this, but they did do an analysis under extraordinary circumstances. You, you say, I think that that would be reviewed to determine whether it was arbitrary and capricious. Correct. They say the same thing.  The extraordinary circumstances definition and just go right to that because that falls under the normal, uh, umbrella of NEPA analysis. Is that what you're saying? As I understand, you're saying the answer is yes, you can bypass that if you want to, under these circumstances. Uh, but to be clear, I want to emphasize if you do go there again, I have a question about the conference report. At the end of it, it says additional limitations to the use of the CE include projects that may look 3,000 acres, wilderness, urban interface, um, temporary, uh, no permanent roads, temporary roads decommissioned in three years. It sounds like additional limitations. It sounds as if they're saying those limitations instead of the, um, extraordinary circumstances limitation. If I understand you correctly, I, no, I... Read of the conference report. I understand what you're saying there, but I urge you to not go that route because it's very clear in our, from plaintiff's point of view, that this statute 6591B, 6591, yes, B, on its face uses terms that have a particular definition and under Supreme Court does. The category exclusion came from the regulation, et cetera. And it, and again, it's two terms, not just one categorical exclusion and scoping. So they are redundant in this requirement. And from a practical point of view, to be very clear here, the only way you can do a significant impacts analysis, which is what scoping requires, is to examine whether there are any extraordinary circumstances. So if you read extraordinary circumstances out of 6591B, you will de facto convert it from a CE, a categorical exclusion, into a categorical exemption. And I strongly urge you, strongly urge you not to let that happen. Thank you. Thanks to both counsel. This is obviously a complex case. We deal with a lot of statutory analysis, but I think because of the interlacing, if you will, statutes from many years, they don't fit. It's almost as bad as the immigration law. Or the international trade law. Or that too, yeah. So we thank you. The case just argued is submitted and the court stands in recess for the day.
judges: M. Smith, Nguyen, Restani